IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA, *ex rel.*,
DR. RICHARD BAER, and DEBORAH WILHELM,

Plaintiffs,

v.

MARY LUDDEN, NATIONAL GOVERNMENT SERVICES, and ANTHEM, INC.,

Defendants.

OPINION & ORDER

13-cv-223-jdp

Relators Dr. Richard Baer and Deborah Wilhelm used to work for defendant National Government Services (NGS), a Medicare Administrative Contractor (MAC). As a MAC, NGS contracted with the federal government to process and pay Medicare claims. Baer and Wilhelm contend that NGS knowingly processed and paid claims that were ineligible for payment, in violation of the False Claims Act, 31 U.S.C. §§ 3729-33. Baer and Wilhelm brought this *qui tam* action in the name of the United States against NGS, its parent company, Anthem, Inc., and Mary Ludden, an NGS executive with responsibility for certain claims payment policies. The United States has declined to intervene. Dkt. 13.

Relators filed an amended complaint, Dkt. 23, which defendants have now moved to dismiss on several grounds, Dkt. 27. The court concludes that relators' complaint is pleaded with specificity sufficient to satisfy Federal Rule of Civil Procedure 9. But the court will dismiss the complaint under Rule 12(b)(6) because it fails to state a claim for relief. Relators' essential theory is that NGS failed to rigorously enforce its "Local Coverage Determinations," to reduce the number of time-consuming and costly appeals, and thereby increase profits. Relators contend that NGS thus knowingly presented for government payment many claims

that were not medically "reasonable and necessary," resulting in enormous losses to the Medicare Trust Fund. Relators fail to state a plausible claim for relief because their theory is based on a fundamental misstatement of the duties of a MAC. Because Medicare claim volume does not allow for individualized review of every claim, MACs have the discretion to—and indeed are required to—target their review efforts to areas that pose the greatest financial risk to the Medicare system and that represent the best use of resources. Ultimately, relators allege that NGS did a poor job of targeting its review efforts, but they do not plausibly allege a False Claims Act claim against defendants.

The court will grant defendants' motion to dismiss.

## ALLEGATIONS OF FACT

The court draws the following facts from the amended complaint, Dkt. 23, and from judicially noticeable information concerning the operation of the Medicare system, which both sides have cited. Although the court must accept as true the well-pleaded allegations in the complaint, *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 463 (7th Cir. 2010), the court need not accept legal conclusions or factual allegations that are merely conclusory or implausible. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

NGS is a wholly owned subsidiary of Anthem, Inc., formerly known as WellPoint, Inc. Anthem formed NGS in 2006 by merging five of its subsidiaries who were Medicare contractors. NGS serves nearly 28 million Medicare beneficiaries in 23 states and five U.S. territories.

Medicare is a national health insurance program established under Title 18 of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, primarily for the disabled and those over the

age of 65. Medicare is administered by the Center for Medicare Services (CMS), a federal agency within the Department of Health and Human Services. CMS contracts with regional Medicare Administrative Contractors, private entities that administer Medicare claims within their geographic jurisdiction. MACs are the primary operational contact between health care providers and the Medicare system. A MAC's duties include enrolling health care providers in the Medicare system, educating providers about Medicare and its billing requirements, processing Medicare claims, arranging for payment of claims, and adjudicating appeals of claim denials. Medicare covers only items or services that are medically "reasonable and necessary for the diagnosis or treatment of illness or to improve the functioning of a malformed body member," 42 U.S.C. § 1395y(a)(1)(A). This is known as the "reasonable and necessary" standard. In a general sense, the job of the MAC is to ensure the prompt payment of claims that meet the reasonable and necessary standard, and to prevent payment of claims that do not.

A MAC also has the authority to make its own determination as to whether a particular item or service is covered in accordance with the overall "reasonable and necessary" standard. At the national level, CMS makes National Coverage Determinations (NCD), which establish whether a particular treatment for a particular condition would be covered anywhere in the country. For example, under an NCD, acupuncture is not considered a reasonable and necessary treatment and it is not covered by Medicare anywhere in the United States. MACs have similar authority to make Local Coverage Determinations (LCD) applicable within their jurisdictions. 42 U.S.C. § 1395ff(f)(2)(B). For example, NGS has an LCD that establishes the circumstances under which cataract extraction would be covered within the territory served by NGS (L33558; available by searching at cms.gov.), and an LCD

that establishes the circumstances under which routine foot care can be covered (L33636, also available by searching cms.gov). The LCDs are not simple rules; they articulate complex criteria by which the reasonable and necessary standard is applied to certain categories of medical treatment.

Each MAC is required to have a Medical Director who is responsible for developing LCDs based on his or her review of the medical literature and medical practices within the MAC's territory. Because LCDs will limit what medical care is covered, MACs must follow specified procedures in enacting LCDs, which require advance notice to the public and the medical provider community. However, MACs are authorized to liberalize or retire LCDs without notice.

MACs have great discretion in how they apply and use LCDs. MACs may automate the application of LCDs by creating "medical review edits," which are coded logic that automatically pay or deny all or part of a claim, or that suspend the claim pending manual review. Although CMS encourages automation, whether to automate any LCD or how to do so is left to the discretion of the MAC.

The volume of Medicare claims is so high that individual review of all claims is impossible. Accordingly, MACs are instructed to target their review efforts, focusing "on areas with the greatest potential for improper payment." Medicare Program Integrity Manual,[1] § 3.2.1. The Comprehensive Error Rate Testing Program (CERT) evaluates each MAC's accuracy in processing claims by reviewing a randomly selected, statistically significant sample of processed claims. CERT personnel review the processed claims and determine the

[1] The Medicare Program Integrity Manual provides a set of standards and processes that govern the activities of MACs. It is incorporated by reference into the MACs' contracts with CMS.

rate of improper payment, thus evaluating the performance of each MAC. Centers for Medicare & Medicaid Services, *Medicare Claim Review Programs* 7 (May 2015), https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/MCRP_Booklet.pdf. In fiscal year 2015, the overall error rate for Medicare fee-for-service payments was 12.1 percent. *Comprehensive Error Rate Testing (CERT)*, Centers for Medicare & Medicaid Services, https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-FFS-Compliance-Programs/CERT (last modified Feb. 8, 2016). For 2016, the improper payment target rate is 11.5 percent so far. *Medicare Fee-for-Service*, PaymentAccuracy.gov, https://paymentaccuracy.gov/tracked/medicare-fee-service-2015 (last visited Mar. 28, 2016).

Relator Dr. Richard Baer was Lead Medical Director for NGS from September 2007 to November 2009. Baer advocated for the prompt inclusion of NGS's LCDs in its automated medical review edits. Relator Deborah Wilhelm, R.N., worked for NGS from January 2007 to November 2009. Her responsibilities included monitoring the inclusion of LCDs in the medical review edits, and she also advocated for the inclusion of the LCDs in the medical review edits. Baer and Wilhelm allege that they were terminated because of their advocacy for the inclusion of the LCDs in the automated medical review edits, which the court will assume to be true for purposes of this motion.

Defendant Mary Ludden is staff vice president of NGS. At the time relevant to this suit, she was Director of Appeals, Overpayment Recovery, Medical Review, and Policy. She was the NGS executive primarily responsible for the implementation of LCDs.

Relators allege that although NGS established LCDs as required, it failed to diligently enforce them in two primary ways: (1) NGS failed to promptly implement its LCDs with

automated medical review edits; and (2) NGS unreasonably retired effective LCDs. According to relators, NGS's failure to enforce its established LCDs caused the payment of many claims for items or services that were not reasonable or necessary. Relators contend that this conduct violated the False Claims Act because NGS falsely certified to the government that it was meeting all of its obligations under its contract, though it knew that it was not, and because NGS submitted claims for payment that it knew were not eligible for payment.

Relators filed a sealed complaint on April 1, 2013, alleging False Claims Act violations. The United States declined to intervene, Dkt. 13, and the court unsealed the case, Dkt. 14. Relators filed an amended complaint, Dkt. 23, which defendants now moved to dismiss, Dkt. 27. The court has jurisdiction under 28 U.S.C. § 1331 because the claims arise under federal law.

## ANALYSIS

An alleged violation of the False Claims Act is effectively an accusation of fraud, which must be pleaded with specificity under Rule 9(b). *United States ex rel. Gross v. AIDS Research Alliance-Chi.*, 415 F.3d 601, 604 (7th Cir. 2005). Defendants contend that the amended complaint does not meet this requirement. The 192-paragraph complaint (with 27 exhibits attached) has many problems, but failure to plead the fraud with specificity is not one of them.

Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." The amended complaint is neither short nor plain, and if the court were not dismissing it for failure to state a claim, it would require relators to re-plead. But the

fraud allegation is clear enough, and detailed enough, to allow the court to summarize the allegations and set out the gist of relators' allegations. The court will deny defendants' motion to dismiss the case under Rule 9.

The real issue is whether the amended complaint states a claim for relief under Rule 12(b)(6). To survive defendants' motion, relators' "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court need not accept legal conclusions or threadbare recitals of the elements of the claim. *Iqbal*, 556 U.S. at 678. The court will not accept as true relators' conclusory allegation that NGS submitted false claims, or that NGS falsely certified that it complied with Medicare regulations or the terms of its contact with CMS. Rather, the court must examine the specific factual allegations of the complaint to determine whether relators have pleaded a violation of the False Claims Act.

Relators' theory of the case is that NGS was obligated to resolutely apply its LCDs to every Medicare claim that it processed, and that it falsely told the government that it was doing so. Under this theory, among the massive pile of claims that NGS submitted for payment, there were many that NGS knew were not eligible because NGS knew that it was not applying its own LCDs. NGS thus knowingly induced the government to make hundreds of millions of dollars of illegitimate payments to Medicare providers. NGS did this, so the story goes, to avoid the high cost of adjudicating the appeals that would result from the denials that would have resulted from the application of the LCDs.

Contrary to relators' hyperbolic contention, this case does not present "the archetypal false claim." Dkt. 36, at 24. The False Claims Act prohibits submitting claims for payment

for services that have not been provided, such as when a physician claims payment for a patient that the physician did not treat. *See, e.g.*, *United States v. Quad City Prosthetic, Inc.*, No. 06-cv-4015, 2011 WL 3273142, at *3 (C.D. Ill. Aug. 1, 2011). The False Claims Act also prohibits submitting claims for payment for goods or services that the contractor knows do not meet the specifications of the contract with the government. For example, a company selling the government defective engine turbine blades, knowing that the blades did not conform to the contract specifications, violates the False Claims Act. *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 850 (7th Cir. 2009). Relators are correct that fraud actionable under the False Claims Act can take many forms, but they have not cited any successful case involving facts analogous to those at issue here.

The most closely analogous case is one relied on by defendants, *United States v. Sanford-Brown, Ltd*., 788 F.3d 696 (7th Cir. 2015), which upheld the dismissal of False Claims Act claims arising from an educational institution's failure to comply with federal law in securing educational subsidies for its students. One principle applied in *Sanford-Brown* is also important here: the violation of a federal contract does not, by itself, establish a violation of the False Claims Act. *Id*. at 710. Relators must allege more than that NGS failed to meet its obligations to the government. Relators must plausibly allege that NGS knowingly submitted false or fraudulent claims to the government.

**A. False claims and false statements under 31 U.S.C. § 3729(a)(1)(A), (B)**

Relators allege that NGS's actions violated several provisions of the False Claims Act, but two of these provisions are the foundation of relators' case. First, relators allege that NGS knowingly presented false or fraudulent claims for payment, in violation of § 3729(a)(1)(A). Second, relators allege that NGS made false statements in support of false claims, in violation

of § 3729(a)(1)(B). To state a claim under the False Claims Act, relators must allege that: (1) defendants made a statement to receive money from the government; (2) the statement was false; (3) defendants knew that the statement was false; and (4) the false statement was material to the government's decision to pay or approve the false claim. *United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 561 (7th Cir. 2015). "Material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." § 3729(b)(4).

The complaint does not state a claim for relief principally because it does not plausibly allege that NGS knowingly made false statements to the government, or that it presented claims it knew to be false for payment. Under the False Claims Act, knowledge means "actual knowledge, deliberate ignorance, or reckless disregard for the truth; knowledge does not require specific intent to defraud." *Marshall*, 812 F.3d at 561.

Relators contend that NGS made three false certifications to the government. Dkt. 36, at 32. Specifically, relators allege that NGS falsely certified that it would make only payments that were reasonable and necessary (Dkt. 23, ¶ 42), that its financial reporting is accurate and complete (*Id.*, ¶ 155), and that it was making "effective and efficient use of Medicare trust fund dollars." (*Id.*, ¶ 156). Each of these is a variation of the same accusation: that NGS knew that it was not meeting its obligation under its contract because it knew that it was processing and paying some claims that were not proper. But this does not plausibly allege knowing falsity.

Given the complexity of Medicare claim processing, which precludes individual review of every claim, the government acknowledges that a certain proportion of Medicare claims will involve improper payments. The overall error rate is more than 12 percent, so even a

high-performing MAC will have a significant proportion of improper payments. But that does not make NGS's certification that it was complying with the terms of its contract—and with the standards that govern Medicare—a knowingly false statement. NGS's duty as a MAC was to reduce improper payments; it was not expected to eliminate them. For a regulatory or contractual violation to support a claim under the False Claims Act, NGS must have expressly certified that it was compliant with the regulations when it knew that it was not. *Sanford-Brown*, 788 F.3d at 711-12 (rejecting the implied false certification doctrine). Relators have not plausibly alleged that NGS knew that it would breach its contract when NGS entered it. Nor have they alleged that during the contract, NGS knew it was breaching its agreement with the government while certifying otherwise.

The heart of relators' complaint is that NGS failed to enforce its own LCDs. Relators contend that once an LCD is established, the Social Security Act "explicitly prohibits the payment of claims that do not meet the requirements of LCDs." Dkt. 23, ¶ 71. But that is incorrect (and the statutory section cited for this proposition, 42 U.S.C. § 1395(a)(1)(g) does not exist). As the Medicare Program Integrity Manual states, there are simply too many Medicare claims to allow for the review of every one. It is left to the MAC to decide how best to ferret out ineligible claims:

> The MACs have the authority to review any claim at any time, however, the claims volume of the Medicare Program doesn't allow for review of every claim. The MACs shall target their efforts at error prevention to those services and items that pose the greatest financial risk to the Medicare program and that represent the best investment of resources. This requires establishing a priority setting process to assure [medical review] focuses on areas with the greatest potential for improper payment.

Medicare Program Integrity Manual § 3.2.1. The LCDs are one of the tools a MAC might use. They serve the purpose of notifying the provider community which items or services will be covered under what circumstances; providers are charged with knowing which items and services will be covered, and they should not submit claims for those that are not. LCDs are effective in this way even when they are not applied in the claim review process.

MACs are supposed to target claim review to areas of likely abuse. One of the target mechanisms is the use of automated medical review edits, which CMS encourages. But CMS does not require that MACs enforce their LCDs through automated edits. The LCDs are not simple rules; they reflect complex criteria under which certain medical items or services are reasonable and necessary. As the documents attached to the complaint show, the process of implementing them as automated edits is sometimes difficult and results in errors. The choice to automate the application of the LCDs is largely left to the discretion of the MAC. Medicare Program Integrity Manual § 3.3.1.2(B). Relators have not plausibly alleged that NGS violated any law, regulation, or contract provision relating to LCDs.

Relators also allege that NGS made false statements concerning its LCDs. Dkt. 23, ¶ 187. Specifically, relators allege that NGS told CMS that it was implementing LCDs through automated edits, but that it was not. *Id.* ¶¶ 81, 83, 94. But that allegation is not plausible because relators acknowledge that by March 22, 2009, 30 percent of the LCDs had been implemented with automated edits. Dkt. 23, ¶ 116. The documents attached to the complaint, Dkt. 23-6 and Dkt. 23-9, suggest that the implementation of automated edits did not meet NGS's original schedule, but relators have not plausibly alleged that NGS made any

specific statement that was knowingly false concerning the implementation of automated edits.[2]

The amended complaint alleges that the relators and others advocated to NGS management, particularly to defendant Ludden, for rigorous application of the LCDs and increased use of automated medical review edits. NGS resisted this idea, according to relators, because it would result in more denials and thus more appeals. But this is an internal debate about "the best investment of resources" applied to the claim review process. Even if relators were fired over their advocacy for the LCDs, the amended complaint does not plausibly allege that NGS knowingly presented false or fraudulent claims, or that it knowingly made false statements in support of a claim for payment.

At most, relators allege that NGS was a poorly performing MAC, perhaps so poorly performing that it breached its contractual obligations to CMS. Any remedy would belong to CMS, which could decline to renew its contract or sue for breach. CMS is well positioned to closely monitor NGS's performance, particularly by monitoring NGS's rate of improper payments through the CERT program. But relators' complaints about how NGS performed its duties as a MAC, even if justified, do not state a claim for making false claims or statements under § 3729(a)(1)(A) or (B).

**B. Avoiding an obligation to pay under 31 U.S.C. § 3729(a)(1)(G)**

Relators also allege that defendants violated 31 U.S.C. § 3729(a)(1)(G), by avoiding their obligation to recoup overpayments of Medicare claims. To state a claim for avoidance,

[2] Relators also allege that in 2009, NGS falsely blamed the delay in implementing edits on a backlog of provider complaints, citing a document attached to the amended complaint, Dkt. 23-6, for support. Dkt. 36, at 32.The complaint does not fairly paraphrase the document. More important, relators have not alleged that the excuse offered for the delay was in any way material to the government's decision to pay any claim.

relators must allege that: (1) defendants made, used, or caused to be made or used, a record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government; (2) the statement was false; (3) defendants knew that it was false; and (4) the government was damaged as a result. *United States ex rel. Ceas v. Chrysler Grp. LLC*, 78 F. Supp. 3d 869, 883 (N.D. Ill. 2015).

Relators contend that NGS had an obligation to recoup any overpayments of which it was aware. According to relators, because NGS submitted claims it knew to be improper, it was aware of the resulting overpayments, and thus of its obligation to recoup them, but NGS allegedly avoided its obligation to do so. Although this allegation implicates a separate section of the False Claims Act, the underlying allegations are substantively the same as those for the false claim and false statement causes of action. Thus, the alleged violation of § 3729(a)(1)(G) fails to state a claim for the same reason: relators fail to plausibly allege knowing falsity.

**C. Conspiracy to violate False Claims Act under 31 U.S.C. § 3729(a)(1)(C)**

Relators allege that defendants conspired to violate the False Claims Act, in violation of 31 U.S.C. § 3729(a)(1)(C). To plead conspiracy, relators must allege that: (1) one or more people agreed to have the government pay a fraudulent claim; (2) one or more of the conspirators performed any act to have the claim paid; and (3) the government suffered damages as a result of the claim. *United States ex rel. Kalec v. NuWave Monitoring, LLC*, 84 F. Supp. 3d 793, 800 (N.D. Ill. 2015); *see also United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 n.3 (7th Cir. 1999) (applying general civil conspiracy principles). The conspiracy claim fails because the relators have failed to state a claim for the underlying violation.

But the conspiracy claim would fail for an additional reason. The amended complaint charges all three defendants with conspiracy. Dkt. 23, ¶ 188. But relators concede that a company cannot conspire with its own employees, Dkt. 36, at 53, thus the conspiracy claim against Ludden must fail. *See McMahon v. Penn. Life Ins. Co.*, 891 F.2d 1251, 1255 n.5 (7th Cir. 1989). Neither can a company conspire with its wholly-owned subsidiary. *United States ex rel. McCarthy v. Marathon Techs., Inc.*, No. 11-cv-7071, 2014 WL 4924445, at *3 (N.D. Ill. Sept. 30, 2014) ("It is settled law that a corporation cannot conspire with its wholly-owned subsidiaries or employees." (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984)). Because NGS is Anthem's wholly-owned subsidiary, they cannot have conspired together. Accordingly, the court will dismiss relators' conspiracy claim.

**D. Defendant Ludden**

Defendants contend that the court should dismiss the claims against Ludden because she was improperly joined as a party and because the amended complaint fails to adequately plead claims against her. Relators did not name Ludden in the original complaint. Dkt. 1. But they added her in their unsealed amended complaint, which alleged the same kind of conduct that the original complaint alleged. *Compare* Dkt. 1 *with* Dkt. 23. When relators file a *qui tam* action on behalf of the government, the complaint must be sealed to give the government the opportunity to investigate and decide whether to intervene. 31 U.S.C. § 3730(b). Once the government makes that decision—and the case is unsealed—relators are free to proceed on their own. *Id.* § 3730(c)(3). Subsequent amended complaints are not subject to the same procedure. *Wisz ex rel. United States v. C/HCA Dev., Inc.*, 31 F. Supp. 2d 1068, 1069 (N.D. Ill. 1998) ("By its terms, the statute applies only to 'the complaint' and

not to any amended complaint."). Accordingly, the unsealed amended complaint adding Ludden to the case was procedurally sound.

The amended complaint also details Ludden's role in the alleged fraud, accusing her of having primary responsibility for the allegedly fraudulent conduct, describing when and how the conduct occurred, and citing to her own emails for support. Dkt. 23, ¶¶ 5, 33, 121-31, 135, 142-47. Thus, the allegations against Ludden would pass muster under Rule 9. But the allegations against Ludden fail to state a claim against her for the same reasons relators' underlying claims fail.

**E. Defendant Anthem, Inc.**

Defendants also contend that court should dismiss the claims against Anthem because relators have not stated a claim for piercing NGS's corporate veil. The court need not reach the issue because it is dismissing the underlying claims against NGS and Ludden.

## CONCLUSION

Because relators have already had an opportunity to amend their complaint, and the amended complaint is set out in extreme detail, re-pleading would not cure the fundamental flaws in relators' theory of the case. Accordingly, the court will not allow relators to amend their complaint, and the clerk will be directed to close this case.

## ORDER

IT IS ORDERED that:

1. Defendants Anthem, Inc., National Government Services, and Mary Ludden's motion to dismiss, Dkt. 27, is GRANTED, and the case is DISMISSED.

2. Defendants' motion to stay, Dkt. 38, is DENIED as moot.

3. The clerk is directed to close this case.

Entered March 30, 2016.

BY THE COURT:

/s/

JAMES D. PETERSON
District Judge